**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TIM CALDWELL and SHARON CALDWELL, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> AKAZOO S.A., F/K/A AKAZOO LTD., F/K/A MODERN MEDIA ACQUISITION CORP., F/K/A MODERN MEDIA ACQUISITION CORP. S.A., APOSTOLOS N. ZERVOS, LEWIS W. DICKEY, JR., WILLIAM DREWRY, ADAM KAGAN, and VÉRONIQUE MARTY, <br><br> Defendants. | Case No. <br><br> COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> <u>CLASS ACTION</u> |

Plaintiffs Tim Caldwell and Sharon Caldwell ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Akazoo S.A. ("Akazoo" or the "Company"), as well as media and analyst

1

reports about the Company and Company press releases. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants (defined below) who: (1) purchased or otherwise acquired the publicly traded securities of Akazoo f/k/a Modern Media Acquisition Corp. ("MMAC" or "MMDM") between January 24, 2019 and May 21, 2020, both dates inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder; and (2) all persons or entities who held common stock of MMAC on August 14, 2019 eligible to vote at MMAC's August 28, 2019 special meeting, seeking to pursue remedies under Section 14(a) of the Exchange Act.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), as well as Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a) and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.      Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

5.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiffs, as set forth in the accompanying Certifications, purchased the Company's securities at artificially inflated prices during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

7.     Defendant Akazoo purports to be a global on-demand music, audio streaming, media, and A.I. technology company with a focus on emerging markets and a presence in 25 countries.

8.     Defendant Akazoo was previously known as Akazoo Ltd., Modern Media Acquisition Corp., and Modern Media Acquisition Corp. S.A. On January 24, 2019, MMAC announced it had entered into an agreement to merge with Akazoo.

9.     Defendant Akazoo is incorporated in Luxembourg, and according to its March 25, 2020 Form F-3 filed with the SEC (the "F-3"), maintains its principal executive offices at One Heddon Street, W1B 4BD, London, UK. Akazoo shares are listed on the NASDAQ under the ticker symbol "SONG" and formerly traded under the ticker symbol "MMDM." The Company's agent for service in the United States, as stated in the F-3, is CT Corporation System, located at 28 Liberty Street, New York, New York 10005.

10.     Defendant Apostolos N. Zervos ("Zervos") is a founder of the Company and was at all pertinent times the Chief Executive Officer ("CEO") and a Director of the Company.

11.     Defendant Lewis W. Dickey, Jr. ("Dickey") was, at all pertinent times, President, Chief Executive Officer, the principal executive, financial and accounting officer and a Director of MMAC and has served as the Chairman of the Board of Akazoo since the merger.

12.     Defendants Zervos and Dickey are collectively referred to herein as the "Individual Defendants."

13.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

14.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

16.     Defendant William Drewry ("Drewry") was a signed or authorized the signing of the Proxy Statement. Defendant Drewry was Chief Financial Officer and the Principal Accounting Officer of MMAC at all pertinent times.

17.     Defendant Adam Kagan ("Kagan") was a Director of MMAC and signed or authorized the signing of the Proxy Statement. Defendant Kagan was general counsel and assistant secretary of MMAC at all pertinent times.

18.     Defendant Véronique Marty ("Marty") was a Director of MMAC and signed or authorized the signing of the Proxy Statement.

19.     Defendants Dickey, Drewry, Kagan, and Marty (collectively, the "Director Defendants"), participated in Board meetings and conference calls, voted to approve the merger, signed and/or authorized the signing of the Proxy, approved the Proxy, solicited approval of the merger through the Board's recommendation that MMAC shareholders vote in favor the merger with Akazoo, which appeared in the Proxy, and permitted the use of their names in connection with the solicitation of proxies from the shareholders. In their capacities as signatories of documents set forth below, as well as by virtue of their authority to approve the merger, the Director Defendants possessed the power and authority to control the contents of the Proxy, as well as MMAC's and the Company's press releases, investor and media presentations, and other SEC filings.

20.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Materially False and Misleading Statements

21.     On January 24, 2019, MMAC filed with the SEC a Form 8-K announcing the merger agreement with Akazoo (the "January 2019 8-K"). The January 2019 8-K was signed by

5

Defendant Dickey. Attached to the January 2019 8-K was the press release issued by MMAC on January 24, 2019 entitled "Modern Media Acquisition Corp. Enters into Merger Agreement with Akazoo Ltd., a global music streaming platform" which touted Akazoo, stating the following:

> In its ninth year of operation, Akazoo is *a leading music streaming service specializing in emerging markets with 4.3 million premium subscribers in 25 countries throughout Europe, South East Asia, South America and Africa*.

*   *   *

> The combined company will continue to be led by Akazoo's experienced management team under the leadership of Apostolos N. Zervos, Akazoo's Founder and Chief Executive Officer. Lew Dickey will serve as Chairman of the combined company.

*   *   *

> **Akazoo Investment Highlights**
>
> • Leading music streaming service with a *customer base of 4.3 million premium subscribers across 25 different countries* with a focus on emerging markets
> • Positioned to benefit from rapid-growth of music streaming industry
>     o Music streaming now accounts for nearly 40% of global recorded music revenues, expected to account for 85% of global music revenues by 2030
>     o Emerging markets are expected to be the fastest growing music streaming markets over the next decade due to the rapid rate of smartphone adoption, and to surpass developed markets in total subscribers by 2024
> • *Successful hyper-local strategy for content curation and cultural relevance with first mover advantage*
> • *Key partnerships with regional and local telecom services and mobile messaging companies*
> • Patented Music AI technology for real-time music recommendations, sonic analysis and automatic playlisting, fully integrated into core platform
> • *Compelling financial profile*, with expected growth from further penetration of existing markets, and expansion into new territories
>     o *Multi-year track record of profitability*
> • *Experienced management team with deep industry and market knowledge well-positioned to oversee organic growth* and expansion into new territories
> • Active M&A pipeline

> MMDM Chairman & CEO Lew Dickey commented, "We are excited to enter into this transaction with Akazoo. *It's a terrific company with strong management led by Founder & CEO, Apostolos Zervos.* As one of the pioneering companies in the space, they have spent the last decade *building a profitable business model with a*

***strong competitive moat in emerging markets***. Music streaming is one of the best secular growth stories in global media and entertainment, and Akazoo is a top global platform that we expect will benefit tremendously from an infusion of growth equity and a public currency to participate in further industry consolidation."

Apostolos N. Zervos, Founder and CEO of Akazoo, remarked: "This transaction marks the beginning of a new phase of growth for Akazoo. ***Our goal has always been to provide our customers with the most relevant and engaging user experience through deep knowledge of local tastes and an expansive library of music content. We have successfully executed on this mission since our inception in 2010 and have done so while obtaining profitability. We are now serving over 4.3 million premium subscribers***, and, as we look to our next phase of growth, we could not be happier to partner with Lew and MMDM. As our Chairman, Lew will bring extensive media industry, public company and M&A experience to the Akazoo team. With a public currency and an infusion of capital, Akazoo will be positioned to expand more rapidly and efficiently than ever before."

David Dorfman, Head of Technology, Media & Telecom – Americas, Europe & Asia of Macquarie Capital, said: "The announced transaction between Akazoo and MMDM is an exciting opportunity for shareholders and customers. ***Akazoo is a fast-growing and profitable business that is poised to benefit from the continued adoption of music streaming across mobile devices. We believe the proposed transaction will enable the company to continue to build on its presence in 25 countries and growing.***"

(Emphasis added.)

22.    Also attached to the January 2019 8-K was an investor presentation (the "January 2019 Investor Presentation") which included the following slides touting Akazoo's finances, distribution rights, geographic reach, "hyper-local" focus, and user base:











## Akazoo is Local



**Akazoo is a leading service in Emerging Markets due to its unique local strategy**

### Local Content



🎵 **25+ million** songs by local artists

🌐 **Territory specific Top 20** updated weekly

💡 **Contextual / statistic-based** playlists

### Culturally Relevant Interface



🎯 **New local releases** prominently featured on home page

📱 **Push notifications** delivered upon release of new content

**Banners** customized to promote local content

📍 **Localized search** with results based on local language preference

STRICTLY CONFIDENTIAL     PAGE 15

---

## Akazoo's Hyper-Local Engine in Action

**Country-specific, customized content curation is unmatched by the competition**

**Local Labels / Content**

**International Labels / Content**

**User Interface Screenshot - Poland**



☐ Indicates Local Artist

STRICTLY CONFIDENTIAL     PAGE 17

## The Opportunity



**Our path to 20 million subscribers and ~€500 million of revenue**

**Market Opportunity Illustration (Existing Markets)**

|  | Today | Long Range Target |
|---|---|---|
| Covered Population[1] | **1.4 billion** | 1.5 billion+ |
| Smartphone Penetration[2] | **50%** | ~70% |
| Addressable Streaming Market (ASM) | **700 million** | 1,050 million |
| Subscribers | **4.3 million[3]** | 20 million |
| Implied Penetration Rate | **0.6%** | 1.9% |

**Revenue and EBITDA Opportunity Illustration (Existing Markets)**

|  | Today | Long Range Target |
|---|---|---|
| Monthly ARPU[4] | **~€2.10** | ~€2.10 |
| Subscription Revenue | **~€100 million** | ~€500 million |
| EBITDA Margin | **10%** | ~15 – 20% |
| Subscription EBITDA | **~€10 million** | ~€75 – €100 million |

(1) Source: www.worldometers.info
(2) Source: www.newzoo.com; Forrester
(3) As of September 30, 2018
(4) Monthly ARPU reflects the average monthly revenue per premium subscriber

**Strong Tailwinds Driving Growth**

✓ 1.4 billion (and growing) population in our markets, with favorable demographics

✓ Increasing smartphone penetration

✓ Growing adoption and importance of music streaming

✓ Potential upside in entering new markets, price increases and M&A

STRICTLY CONFIDENTIAL                                                    PAGE 19

## Financials and KPIs



**Tosca Penta's injection of €17m in 2015 led to 80+% revenue growth in 2016**



Note: Akazoo projections assume base case cash available of $60 million post-close

STRICTLY CONFIDENTIAL                                                    PAGE 21



23.     On February 12, 2019, the Company filed with the SEC a prospectus on Form F-4 signed by the Director Defendants. On March 29, 2019, June 11, 2019, July 20, 2019, August 12, 2019, and August 14, 2019, the Company filed substantially similar revised versions of the prospectus for the merger on Forms F-4/A with the SEC. On August 15, 2019, MMAC issued the Proxy Statement with the SEC on Form 424(B)(3) which was signed by Defendants Dickey and Zervos. The Proxy Statement contained a discussion of MMAC's due diligence into the Company, in relevant part:

> On June 22, 2018, Mr. Dickey and representatives of Macquarie, on behalf of the sponsor, held a conference call with representatives from Akazoo — including Mr. Zervos –to *engage in a financial due diligence discussion* and to discuss the merits of Akazoo as a potential merger candidate for MMAC. Considerations included Akazoo's rapid historic and projected growth, its potential attractiveness as a public company and the favorable demographic and economic trends in Akazoo's target markets. *MMAC also began to undertake a more detailed analysis, and began to conduct due diligence on Akazoo*, including conducting research on emerging markets' music industries, reviewing materials provided by Akazoo, evaluating Akazoo's competitive positioning and assessing general

economic and demographic trends. ***MMAC's due diligence included consultation with independent experts as well as a review of various research reports and studies on the music streaming market.*** . . .

***Throughout July 2018, MMAC continued to conduct its ongoing due diligence on Akazoo.*** Several teleconferences were held between representatives of Akazoo, including Messrs. Zervos and Schreuder, and representatives of MMAC, including Mr. Dickey and Macquarie, on behalf of the sponsor, to ***review Akazoo's strategic, marketing and operations plans, and management forecasts. During this time, Akazoo also shared various materials with MMAC, and MMAC and its advisors reviewed such materials, including certain material contracts of Akazoo.***

On August 2 and 3, 2018, Messrs. Zervos and Schreuder met with Mr. Dickey and representatives of Macquarie, on behalf of the sponsor, at Macquarie's offices in New York City. ***The meetings included a detailed review of Akazoo's operations, business plan and financial model, the music streaming market, and a discussion about the potential structure and process for a possible transaction.*** The meetings also included discussions about the dynamics involved in completing a business combination with a SPAC. The discussions also included consideration of various alternative jurisdictions where the combined company would be domiciled and base its operations, which included considerations regarding currencies, tax matters, where existing competitors in the music streaming sector were domiciled, and jurisdictions that might be attractive to the capital markets generally, and to investors, or potential investors, in Akazoo, MMAC and/or PubCo in particular.

Between August 3 and October 25, 2018, MMAC and Akazoo were in frequent communication, through email and teleconferences. Topics and matters discussed were ***focused primarily on MMAC's ongoing due diligence, including with respect to Akazoo's business plan and management forecasts***.

\*          \*          \*

From November 5 through November 7, 2018, ***Mr. Dickey and a representative of Macquarie, on behalf or*** [sic] ***the sponsor, travelled to Greece and London to conduct on-site due diligence and to meet with other members of Akazoo's management team, employees and other stakeholders***.

\*          \*          \*

On December 14, 2018, the Board held a meeting by teleconference. At this meeting, ***Mr. Dickey and representatives of Macquarie updated the Board on the negotiations with Akazoo, on the continuing due diligence process***, and on the proposed structure, valuation and timing for the potential business combination with Akazoo.

13

From December 24, 2018 until January 24, 2019, MMAC and its counsel continued to work closely with Akazoo and its U.S. and U.K. legal counsel, including holding conference calls to update the parties on progress with respect to draft transaction documents, MMAC's due diligence and other outstanding issues. . . .

. . . The Board, having recognized that it was unlikely that a business combination would be completed by the February 17, 2019 deadline, determined that it was in the best interest of MMAC, and its public stockholders, to seek to extend the deadline by four months, to June 17, 2019. The Board recognized that, pursuant to the MMAC Certificate of Incorporation, the public stockholders would be entitled to request redemptions of their shares of MMAC common stock in connection with such a vote to extend the deadline. The Board also recognized that, while any redemptions would have a potential impact on MMAC's ability to satisfy the proposed condition that MMAC have a minimum of $60 million in cash available from the trust account at closing of the Business Combination, they believed that having the opportunity to continue to pursue the potential business combination with Akazoo was in the best interests of MMAC and its public stockholders.

On January 7, 2019, the Board met again by teleconference, with all board members present, along with representatives of Macquarie, on behalf of the sponsor, and Jones Day. ***Mr. Dickey and the representatives of Macquarie reviewed the financial and business due diligence reports prepared by management and their advisors, and updated the Board on the prospective transaction, its structure (including the redomiciliation of MMAC as a Luxembourg corporation in the Business Combination), and prospects.*** They also reviewed estimated valuation ranges for Akazoo based upon various approaches and analyses. ***After considerable review and discussion, the Business Transaction Agreement and related documents and agreements were unanimously approved by all directors***, subject to final negotiations and modifications of the documents, and the Board determined to recommend the approval of the Business Transaction Agreement to MMAC's stockholders. . . .

\*       \*       \*

**MMAC's Reasons for the Business Combination and Recommendation of MMAC's Board**

On January 7, 2019, ***the Board unanimously*** (i) approved the Business Transaction Agreement and the Business Combination contemplated thereby, (ii) determined that the Business Combination is in the best interest of MMAC and its stockholders, (iii) directed management, together with MMAC's legal counsel, to complete ongoing confirmatory due diligence and finalize all ancillary documents and agreements, (iv) directed that the Business Transaction Agreement be submitted to MMAC's stockholders for approval and adoption, and (v) recommended that MMAC's stockholders approve and adopt the Business Transaction Agreement.

> ***Before reaching its decision, the Board considered the results of management's
> due diligence***, which included. . .
>
> • ***Extensive meetings and calls with Akazoo's management team regarding
> operations and projections***;
> • Research on the global music streaming industry, including historical growth
> trends, market share information and market size projections;
> • ***Review of Akazoo's material contracts, intellectual property matters, labor
> matters, and financial, tax, legal, and accounting diligence***;
> • Creation of a financial model with Akazoo's management team; and
> • ***Reports relating to financial, accounting, tax, and legal diligence***.
>
> (Emphasis added.)

24.     The Proxy Statement stated the following, in pertinent part, regarding Akazoo's

business, plans, and financials:

> In considering the Business Combination, the Board concluded that Akazoo met all
> of the above criteria. In particular, the Board considered the following positive
> factors, although not weighted or in any order of significance. . .
>
> • *Hyper-Local Strategy*. ***Akazoo has built a competitive advantage with its focus
> on local content sourced from local providers in a culturally relevant interface
> designed to cater to specific tastes of target audiences and drive customer
> acquisition and retention. Additionally, Akazoo utilizes local content and
> partnerships with local telecom services to seek to drive profitability and reduce
> costs***. . . .
> • *Compelling Financial Profile*. Akazoo demonstrates a strong growth profile with
> diversified revenue. ***Akazoo's 2018E-2021E revenue compound annual growth
> rate of approximately 40% is expected to be driven by further penetration of its
> target user base within current markets, with additional growth potential through
> market expansion***. Akazoo's business model has generated positive EBITDA each
> year since inception, driven by disciplined sales and marketing expenses and low
> content costs.
> • *Experienced Management Team*. ***Executive leadership team with deep industry
> and market knowledge that is well-positioned to oversee organic growth and
> expansion.*** Akazoo's team would be bolstered by the public company experience,
> executive leadership and acquisition track record of Lew Dickey.
> • *Alignment of Interests of Shareholders*. As a growth company operating primarily
> in developing markets, ensuring that the interests of the shareholders of both
> Akazoo and MMAC, who would hold equity in the combined company based upon
> the relative values of the respective companies were aligned and that each group
> had the opportunity to participate, through their equity ownership in PubCo after
> the Business Combination, in that growth, was a compelling factor considered by
> the Board.

\*       \*       \*

Based upon the wide variety of factors that the Board considered, the Board concluded that the potential benefits that it expected MMAC and its stockholders to achieve as a result of the Business Combination outweighed the potentially negative factors associated with the Business Combination. ***Accordingly, the Board unanimously determined that the Business Transaction Agreement and the transactions contemplated thereby, including the Business Combination, were advisable, fair to, and in the best interests of, MMAC and its stockholders.***

\*       \*       \*

## INFORMATION ABOUT AKAZOO

### Business Overview

Founded in 2010, Akazoo is a global, on-demand music streaming subscription company ***with a focus on emerging markets and a hyper-local strategy***. . . . ***Akazoo's music streaming service is offered in 25 countries, while its platforms currently include 38.2 million Registered Users and 4.6 million Subscribers*** as of December 31, 2018. . . . [Image omitted.]

***For the years ended December 31, 2018 and 2017, Akazoo generated revenues of approximately €104.8 million and €90.0 million, respectively.*** For the years ended December 31, 2018 and 2017, Akazoo generated EBITDA of €10.7 million and €10.1 million, respectively. ***Since 2010, Akazoo has expanded in a profitable manner to 25 markets to date without offering a "freemium" model but by adapting its services for local tastes and consumption.***

\*       \*       \*

While competition is significant, Akazoo differentiates itself in a number of unique ways. ***First and foremost, its "hyper-local" business model focuses on delivering a user experience adapted to local consumption patterns and behavior, through true localization of service language***, pricing and billing methods. Second, Akazoo focuses on offering the most relevant music catalogue content to local listeners as most emerging market listeners consume mostly local language and local artist content. Akazoo's data and third party research empirically demonstrates that every region and territory has its own unique tastes and preferences. Akazoo's platform is designed to deliver content to dynamically satisfy personal user tastes within a local and regional context, using sophisticated AI algorithms and machine enhanced catalogue curation. Finally, by targeting emerging markets with niche listening habits, Akazoo delivers music content catered to a large, growing, and underserved population of the world.

16

Akazoo's belief is that music is not "one size fits all," and as such, the data shows that the majority of the content consumed in emerging markets is "local," as opposed to "global." ***By developing deep relationships with local labels, telecommunications operators, brands and device manufacturing OEMs, as well as music content producers, Akazoo has established itself as the trusted streaming service in its existing markets. In addition to its focus on local music, Akazoo also licenses content from substantially all the major labels and independent consortiums and offers streaming of the world's top artists and songs, which transcend local tastes and national borders.*** However, ***Akazoo's core value proposition lies in being able to connect with local listeners in a culturally relevant manner, curating playlists that prominently feature the local music they love***.

Relatedly, ***Akazoo has achieved success in growing its total user and Subscriber base by partnering with relevant, popular and trusted telecom operators, mobile application providers, original equipment manufacturers (OEMs) and other brands***. These companies possess vast user bases and robust delivery infrastructures to help raise Akazoo brand awareness and build upon Akazoo's user base. Akazoo has enjoyed success employing this strategy throughout the world as up to an estimated 20% of its total user and subscriber base is derived from these partnerships.

*       *       *

**Hyper-Local Platform**

***Akazoo's hyper-localized platform and strategy allow it to uniquely cater its service to the markets Akazoo serves.***

***Local Content***. Akazoo maintains a robust library of music content created by local artists in its target regions, which is constantly being updated and expanded. ***The "Top 20" and other playlists seen by Akazoo's users are territory-specific and updated weekly to reflect the latest trends.*** Akazoo's playlists cover all music genres and styles, various contexts, brands and themes. ***Akazoo curates its playlists meticulously based on local trends, user input and sonic similarity as determined by Akazoo's patented recommendation engine. Akazoo procures content from about 400,000 labels, including major, independent labels as well as local labels and content providers. Akazoo's strong relationships with these providers allow it to have access to the most popular content when it becomes available***, and, in turn, Akazoo's users see new releases featured prominently on its platform. Akazoo's content marketing team creates advertising assets customized to promote local content, including display advertising and messaging campaigns delivered to their mobile devices when new content is released.

***Akazoo's technology stack uniquely allows it to serve this local content to emerging markets*** and deliver a high quality user experience in varying network

17

environments. Akazoo's low data streaming technology enables it to serve regions covered by 2G, 3G, 4G and 5G wireless networks without diminished quality or excessive data usage with a high-quality user experience. In many of the regions Akazoo serves, Akazoo has been the first music streaming service to enter the market and reach scale, and thus owns a significant "first-mover advantage."

*Local Partnerships. Akazoo gains access to millions of potential users worldwide through its relationships with local blue-chip telecommunications, mobile messaging and OEM providers.* Through bundles, free trials, pre-loading and promotions, Akazoo benefits from the conversion of a portion of its partners' customer bases into Akazoo subscribers. Akazoo also offers its partners customized user interfaces, cloud-based and local transcoding infrastructure and complete integration with partners' platforms where applicable. These partnerships are especially impactful in Akazoo's target regions given the decidedly "mobile-first" nature of emerging markets.

\*        \*        \*

**Business Model**

Akazoo offers a subscription based music streaming service and a free, ad-based Radio Service. Akazoo's Radio Service achieves a funnel effect for user to subscriber conversion without the losses associated with content costs of a free on-demand streaming service. Akazoo's radio proposition adds high value to Akazoo's product mix as it offers revenues streams from passive listeners unwilling to commit to a premium subscription initially. *Akazoo's commitment to delivering hyper-local music to customers has allowed it to significantly grow its business in emerging markets, as many other players in the industry tend to focus on globally popular content, ignoring a subset of the music that is especially popular in emerging markets. Akazoo has grown its Subscriber base from 1.8 million in 2015 to 4.6 million as of December 31, 2018.*

\*        \*        \*

*De-risked customer acquisition through partnerships.* Akazoo has historically entered into partnership agreements with telecommunications providers, messaging platforms, OEMs and brands to help grow its Subscriber base while maintaining low variable costs. Through such partnerships, Akazoo is offered as an add-on service to the partner's subscriber base at a discount to the standard subscription service. Some partnerships offer Akazoo as part of an overall tariff with one price, or bundled and pre-installed into a device. Through these partnerships, Akazoo has direct access to consumers and is able to maintain low sales and marketing costs.

Although Akazoo shares its revenue with its business partners through such arrangements, it realizes significant synergistic revenue that allows it to remain profitable and generate consistent market penetration.

*Profitability*. . . . The licensing costs of local repertoire can be lower than for global or international releases or catalogues. Due to Akazoo's focus on locally relevant music, Akazoo is able to efficiently manage its content costs. ***Additionally, Akazoo's partnerships contribute to customer acquisition cost reduction (CAC), facilitating robust margins and profitability that Akazoo expects to continue as it penetrates its existing markets and expands into additional markets.*** . . .

***Partner Campaigns. By partnering with regional and local telecommunications services, mobile messaging companies and device manufacturers and OEMs, Akazoo is able to quickly and efficiently access a wide swath of its target customers. Akazoo has built and expects to continue to build relationships with these companies in every market where Akazoo currently has a presence, and plans to continue to do so as Akazoo enters new markets.*** These efforts with telecommunications services are generally referred to as "bundling," as the Akazoo app is included ("bundled") with the phone or mobile plan when purchased. In addition, certain partnerships allow Akazoo to have the Akazoo mobile app loaded onto the mobile phones of their customers. For Akazoo, such an initiative reduces the costs required to build brand awareness and removes customer friction in discovering and downloading the app. Akazoo is able to execute bespoke agreements with multiple local telecom carriers, which facilitates a low-cost method of expanding its customer base in its markets.

*     *     *

**Licensing Agreements**

In order to stream music to its users, Akazoo generally secures rights to both the sound recordings and musical compositions. . . . ***Akazoo has license agreements with record label affiliates of the three largest music companies – Universal Music Group, Sony Music Entertainment, and Warner Music Group – as well as numerous independent record labels.*** These agreements require Akazoo to pay royalties, usually on a subscriber or subscription basis, make minimum guarantee payments, and commit marketing placements to labels for their catalogue. . . .

The process of obtaining musical composition rights varies from country to country. For example, in most territories in Europe and Asia, Akazoo negotiates with the local collecting society in each territory in order to obtain both the mechanical and public performance rights, as well as with a number of publishers directly.

*     *     *

*Label relationships/payments*. The music streaming industry is particularly difficult to enter due to the need to secure large numbers of contractual relationships with music labels and content producers. Each country and market has different

19

players in the music label space, creating a massive network of content providers that each music streamer must execute contractual agreements with in order to stream their music. ***Through its growth and development over the years, Akazoo has forged strong relationships with a large number of global, regional and local content providers, which it believes will keep it ahead of any new competitor who seeks to enter the market.***

\*      \*      \*

***Brand Awareness and First Mover Advantage***. New players looking to enter the music streaming market will likely inevitably struggle with brand awareness in an already developed market. ***Akazoo's numerous years spent building its brand, often with first mover advantage in its core markets, have enabled it to become a market leader in delivering high quality local music content.*** By consistently delivering high quality content to its customers and ***actively promoting in its markets through paid and earned media and live events, Akazoo believes it has built a robust brand that secures its competitive position and profitable business model.*** Akazoo's first mover advantage will continue to facilitate growth and increased market share for its business ***as Akazoo efficiently increases penetration in existing markets and expands into new regions***.

\*      \*      \*

## Business and Growth Strategies

Akazoo intends to maintain a leading market position and increase revenue and profitability by deeper penetration of its existing markets, as Akazoo believes there is significant scope to do so by pursuing the following strategies:

***Increasing partnerships***. ***Akazoo increasingly drives growth through strategic B2B partnerships with messaging services, MNOs, ISPs, OEMs and brands through co-promotion or bundling offers.*** Proceeds are expected to be invested in business development efforts to increase the depth of these partnerships as well as increasing the number and the activities performed with such partners.

***New Market Expansion***. ***Akazoo has shown a proven ability to efficiently select and expand into new markets***, while maintaining a disciplined focus on deploying capital and resources. In selecting new markets, Akazoo selects markets based on the potential impact it can make as a localized service. Often times, Akazoo enters into a partnership with a partner that allows for high distribution potential and brand recognition. Industry dynamics also play a factor as far as favorable smartphone penetration and demographics.

\*      \*      \*

## Subscribers

*. . . For 2018 as compared to 2017, Subscribers increased by 0.8 million or 22%, and for 2017 as compared to 2016, Subscribers increased 0.5 million or 14%. Subscriber growth has been driven largely by our in-house marketing efforts and paid acquisitions in this period.*

Following the strong growth from 1.8 million subscribers as of December 31, 2015 to 3.3 million as of December 31, 2016, growth in 2017 and 2018 was managed by the Company in order to make necessary changes to the Company's platform and infrastructure in order to absorb the strong growth achieved in 2016. The first outside capital investment of approximately €17 million (£12 million) by one of our major shareholders, Tosca Penta Capital, in 2015 translated in strong subscriber (87%) and revenue (86%) growth in 2016.

**Registered Users**

Registered Users are defined as users that have registered for the Service, are currently a Subscriber, have been a Subscriber historically or are currently signed up for a free trial. . . . *Our Registered Users have increased over time in line with our Subscribers and reached 38.2 million Users as of December 31, 2018*. . . .

**Revenue**

Factors influencing revenues include a number of territory variables. . . . *Other factors that influence territory revenues are the level and mix of media campaigns used to grow our subscriber base in each market*, conversion rate of free to paying subscribers and monthly churn rate of existing subscribers. The evolution of costs of revenues correlates to media spend which in turn correlates to the evolution of revenues. . . .

*For the year ended December 31, 2018 as compared to 2017, Revenue increased €14.8 million, or 16%, driven by an increase in Subscribers and a slight increase in overall ARPU.* The Company managed its growth in 2018, as a result of limited access to growth capital.

*For the year ended December 31, 2017 as compared to 2016, Revenue increased €21.6 million or 32%, driven primarily by an increase in Subscribers, partly offset by a decrease in ARPU.* In addition, the Radio Service delivered its first, although minor, revenues in 2017.

\*       \*       \*

**Gross Profit and Gross Margin**

*For the year ended December 31, 2018 as compared to 2017, gross profit increased €2.6 million, or 13%,* and gross margin decreased slightly from 23% to 22% due to increased spending for customer acquisition.

***For the year ended December 31, 2017 as compared to 2016, gross profit increased €5.2 million, or 33%,*** and gross margin remained constant at 23%. . . .

(Emphasis added.)

25.     On September 11, 2019, Akazoo issued a press release announcing the completion of its reverse merger with MMAC and the beginning of its shares trading on the NASDAQ under the symbol "SONG" (the "September Press Release"). The September Press Release also stated the following regarding the Company's revenue growth:

> In the first half of 2019, the Company's revenues grew 39% year-over-year. Growth is expected to be driven by an array of existing and new partnerships that include mobile operators, handset manufacturers, media and partnering mobile applications and services, as well as growth in smartphone penetration in their core markets.

26.     The September Press Release touted the Company's global positioning, stating: "***Akazoo S.A., SONG, operates in 25 countries***, including emerging markets that represent the music streaming industry's fastest growing market opportunities. Akazoo's platform boasts patented Sonic AI music recommendation and profiling technology, ***developed to support its hyper-local strategy***." (Emphasis added.)

27.     The September Press Release also touted the Company's subscriber growth, stating: "In the last 5 years, SONG's premium subscribers have grown from 1.1 million in 2014 to over 5.3 million today."

28.     On September 27, 2020, Akazoo filed with the SEC a Form 6-K, signed by Defendant Zervos, which provided the financial statements of Akazoo and MMAC before the merger (the "September 6-K"). The September 6-K provided the following regarding Akazoo's finances:

**Financial Statements**

**Interim Condensed Consolidated Statement of Operations**

*(Unaudited)*

*(in € thousands, except share and per share data)*

| | Notes | Three months ended June 30, | | Six months ended June 30, | |
|---|---|---|---|---|---|
| | | 2019 | 2018 | 2019 | 2018 |
| Revenues | | 33,804 | 24,627 | 64,521 | 46,455 |
| | * | * | * | | |
| **Gross profit** | | 8,268 | 5,384 | 15,689 | 10,432 |
| | * | * | * | | |
| **Profit attributable to Akazoo Limited** | | 1,308 | 1,362 | 3,108 | 2,808 |

29.     On December 9, 2019, Akazoo issued a press release entitled "Akazoo Reports Third Quarter 2019 Results" (the "3Q 19 Results"). The 3Q 19 Results stated the following regarding the Company's revenue and cash:

· *Q3 Revenue of €35.0 Million, Up 24% YoY*
· Nine Month 2019 Adjusted EBITDA of €11.3 Million – Ahead of FY 2019 Guidance of €11m
· Raising FY 2019 Revenue Guidance from €134 Million to €136.5 Million - up 30% YoY with QoQ revenue growth accelerating in Q4

*        *        *

*Revenues increased 24% to €35.0 compared to €28.1 million in the third quarter of 2018, driven principally by ongoing user acquisition spending with Eastern European and select LATAM territories leading growth trends*.

*        *        *

*Interim Condensed Consolidated Statement of Operations*

*(Unaudited)*

*(in € thousands, except share and per share data)*

|  | Three months ended September 30, | | Nine months ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2019 | 2018 | 2019 | 2018 |
| Revenues | 34,959 | 28,095 | 99,480 | 74,550 |

(Emphasis added.)

30.     The 3Q 19 Results provided that subscribers increased from 4.3 million to 5.5 million from the third quarter 2018 to the third quarter 2019, a 28% increase. The 3Q 19 Results also provided that registered users increased from 37.8 million to 44.4 million from the third quarter 2018 to the third quarter 2019, an 18% increase.

31.     On March 19, 2020, Akazoo released an investor presentation (the "Presentation"). The Presentation touted the Company's financial position:





32.     The Presentation also touted the Company's global reach, music distribution rights, and deep local knowledge and abilities with substantially the same slides as the Company's January 2019 Investor Presentation cited above and the following, in pertinent part:



33.     The statements referenced in ¶¶21-32 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Akazoo overstated its revenue, profits, and cash holdings; (2) Akazoo holds significantly lesser music distribution rights than it has stated and implied; (3) as opposed to Akazoo's continued statements, it does not operate in 25 countries; (4) Akazoo has a significantly smaller user base than it states; (5) Akazoo has closed its headquarters and other offices around the world; (6) Akazoo does not have "hyper-local" focus or abilities; (7) Akazoo does not have the extensive business-to-business deals across the globe that it claims; (8)

MMAC did not engage in proper due diligence; and (9) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

34.     The statements referenced in ¶¶23-24 above from the Proxy Statement were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Akazoo overstated its revenue, profits, and cash holdings; (2) Akazoo holds significantly lesser music distribution rights than it has stated and implied; (3) Akazoo's does not operate in 25 countries; (4) Akazoo has a significantly smaller user base than it states; (5) Akazoo does not have "hyper-local" focus or abilities; (6) Akazoo does not have the extensive business-to-business deals across the globe that it claims; and (7) MMAC did not engage in proper due diligence.

<b><u>The Truth Emerges</u></b>

35.     On April 20, 2020, Quintessential Capital Management ("QCM") released an equity report (the "Report") detailing, among other things, how Akazoo misled investors and failed to disclose pertinent information, including: (i) Akazoo's overstated its users, subscribers, revenue and profit; (ii) Akazoo overstated the size of the of the Company and its services; (iii) Akazoo overstated where the Company's service is actually available; (iv) Akazoo is and has been closing offices and losing employees; (v) Akazoo does not specialize "hyper-local" content; and (vi) Akazoo does not currently have lucrative deals with mobile operators in its markets.

36.     The Report stated the following, in pertinent part, about the Company's finances:

. . . what we see at Akazoo, with large discrepancies between earnings and cash flow, sizeable investments in IP and a level of account receivables grossly out of line with its peer group. ***We also observe with great concern, that Akazoo has paid***

27

*zero taxes for at least the past four years, despite claiming $21.7m of accounting "profit".*

*       *       *

**The curious case of Solutions System Touchmedia a.k.a Veoo Malaysia**

*       *       *

InternetQ [Akazoo's former parent company] was then [2013] doing business with a Malaysian company (Touchmedia) "related to the Group's CEO Panagiotis Dimitropoulos" for the provision of the following services:

• Monthly billing of Malaysia operators
• Collection of Revenue from Malaysian operators

We find it disturbing that a company whose accounts have been questioned as suspicious, was using for its billing and revenue collection a payment processing firm that is "related" to its CEO. ***Clearly, the control of a payment processor could enable a dishonest management to alter the accounts and provide a less than truthful picture of the financial situation of the company.*** Although, this situation relates to InternetQ, not necessarily Akazoo, given the close ties between the two companies we cannot ignore it.

*       *       *

***Similarly, the Company might hide any cash shortfall by inflating costs, especially cost of goods sold ($100m in 2019) and investments in intangible assets ($11m in 2019).*** The former consists primarily in royalties paid to music label companies. ***We hypothesize that Akazoo might have either colluded with, or outright fabricated, small music label companies that generate fictitious cost invoices for non-existing music streams.***

(Emphasis added.)

37.     The Report stated the following, in pertinent part, about the Company's music

distribution rights:

**Alleged copyrights violations**

Music streaming companies typically purchase music (along with territorial copyrights) from large music distributors. ***We checked with Sony Music, from which Akazoo has purchased the full catalog for redistribution. Surprisingly, despite claiming to be active in 25 countries, Akazoo has purchased from Sony copyrights valid for only five countries, namely Greece, Cyprus, Poland, Ghana***

28

*and Malaysia.* Obviously, this creates some worrying question marks: has Akazoo exaggerated the number of countries from where it is operating? Has the Greek company been distributing music in certain countries in breach of copyrights (a breach that typically carries very expensive fines)?

For example, we know that Akazoo's service is currently active (if barely used) in Indonesia and has been active in Singapore, Thailand. According to our investigation, Akazoo has no rights to distribute Sony music in these territories and hence may be exposed to serious repercussions.

(Emphasis added.)

38.     The Report stated the following, in pertinent part, about the Company's global reach, business-to-business deals, and "hyper-local" focus and ability:

**Doubts on geographic reach**

In its official filings and presentation to investors, Akazoo claims to be active in 25 countries[.] [Image omitted.]

Being a music-streaming business, the map above presumably indicates that Akazoo is actively selling music in the countries appearing on the map. In its 2019 SEC filings Akazoo highlights:

*"Akazoo's revenue is derived primarily in emerging markets (including **Poland, Russia, Malaysia, Thailand, Indonesia, Ecuador, Brazil and Mexico**, among others). The success of the business is largely dependent on the continued demand for music streaming services in these regions".*

QCM's investigation, however, suggests otherwise. First of all, using local contacts in key markets as well as a VPN, we attempted opening accounts in dozens of countries (including many of those in the list above), but in most cases, we received the following message from Akazoo:

"We would really like to be here. For now, our service is not available in your country. Please check back, you never know."

***The only countries where we did manage to open an account were Greece, Cyprus, Poland, Malaysia and Indonesia.*** It is apparently ***not possible to become an Akazoo client in either Russia or Brazil, two of the largest markets that Akazoo claims to be operating in***. This is in line with the options on the app itself which only has these five countries as possible choices of residence (and this stage is only accessible if you are located in one of those five countries).



\*     \*     \*

### Key Market Poland

Starting in late 2014 Akazoo did have a partnership with Orange Polska SA, providing them a white-label streaming service called *Muzyka-Tu-i-Tam*. . . . Former clients of *Muzyka-Tu-i-Tam* were migrated onto Spotify by Orange with a three-month free Premium subscription. ***The Tu-i-Tam service does not appear to exist since mid- 2016. Currently all Polish operators have streaming music partnerships that they actively promote on their websites – none involving Akazoo***[.] . . .

***On the Polish Google Play app store the most recent reviews as of February 2020 are two from 2018, one from 2017*** and a few complaints from 2016. Some older reviews hint that the  reviewers were only downloading it in order to earn credits on a third-party app. However, a grand total of three reviews (!) over the past three years is a clear sign that there is practically no usage. ***For comparison, Spotify has 20-25 reviews per day from Polish Google App store users.*** Spotify does not disclose its subscriber numbers in Poland but the annualized ratio of its reviews to Akazoo's suggests 7,300 : 1. ***Even with an optimistic assumption that Spotify has 19m subscribers (50% of the Population), we would therefore estimate Akazoo to have around 2,000 subscribers in this "key market"*** – even with a margin of error of a factor of 10, this is an insignificant number.

\*     \*     \*

### Key Market Russia

***The Akazoo Music app has been available on the app store since at least 2017. However, in all that time it seemingly was not possible for Russian users to register or log in*** as evidenced by the sporadic commentary of users who seem to

have stumbled on it. ***It has also never been translated into Russian*** (a frequent complaint below from people who didn't even manage to get to the point where they are told the service is not available in their country) and ***remains unavailable for registration today.*** [Image omitted.]

**Key Market Brazil**

***The service is not available in Brazil.*** It is possible to download the app and there is a Portuguese language page that confirms the service is not available. It is not permitted to open an account or log in with an existing account. This has been tested on multiple local mobile phones and networks. Judging by the comments on the Google App store, this has been the case since at least May 2019 (comments saying it is not possible to log in). [Image omitted.]

In prior years there was some modest commentary activity with a small number of people evidently trying the service out. The vast majority of the reviews were negative with one star. Having taken the time to count them individually, it looks like momentum faded after 2016 – not that 81 reviews per year indicates a popular app. [Chart omitted.]

It is not that Brazilians are shy about commenting Spotify gets hundreds, if not thousands of reviews every single day in Brazil, mostly five stars (it's quite hard work just to scroll down to get to the previous day). . . .

**Key Market Indonesia**

It is still possible to subscribe to Akazoo in Indonesia at time of writing. And yes, there was a stream of comments (often even multiple comments on the same day) on the Play Store during 2016 and 2017, carrying into the first months of 2018 when clearly there was some attempt to promote the service in the country. Since then things have clearly tapered off – ***the last comment dates back to 27th May 2019, being the final of only five comments that year***. [Image omitted.]

***While much of this historic activity was likely paid for (the comments rarely say anything useful – typically 5\* and "OK good"), this suggests that, unlike in all the other "key" markets, genuine attempts were made to establish the service in Indonesia.*** It is also worth noting that the Spotify app continues getting approximately 100 comments every single day on the Indonesian store (less than in Brazil but still many multiples of Akazoo at its peak activity in 2016). Unfortunately, these attempts have been abandoned over a year ago and the resulting drop in activity suggests that they were ultimately unsuccessful in building any sort of brand or growing user base.

\*       \*       \*

**Key Market Malaysia**

Akazoo did claim a partnership with Sony Ericsson in Malaysia in 2015, whereby the manufacturer preloaded its phones with Akazoo Music software. This would not have been relevant as even then Sony's market share would have been miniscule and has declined further since.

***Although Malaysia is one of the handful of markets where it is actually possible to sign up for the service, activity on the Google Play Store is negligible. The latest comment dates back to July 2017*** and there is only around a dozen comments in total. Clearly Malaysians are not engaging with Akazoo via the flagship app and it cannot account for any significant number of subscribers.

*        *        *

**Key Market Thailand**

***It is seemingly not possible to subscribe to Akazoo in Thailand even though the website has been translated into Thai.*** The Thai Play store shows minimal activity over the past years so ***it is safe to say this was never an active market***.

**Key Market Mexico**

***It is seemingly not possible to subscribe to Akazoo in Mexico even though the website has been translated into Spanish.*** The Mexican Play store shows minimal activity post 2014 (with just a handful of reviews in that year), so ***it is safe to say this was never an active market.*** Confirmation also from the year 2020 that it is not possible to register.

*        *        *

**Knowledge of Emerging Markets?**

A claimed advantage of Akazoo is an intimate knowledge and AI processing of local music tastes. This ostensibly allows them to stream local artists who let them do it at lower cost than global artists. To illustrate this, they present the following:



Let's pause for a minute on the ***"Top 5 Artists on Akazoo in Brazil", which is an example of a huge potential market with a dynamic local music scene – and the fastest growing for Akazoo according to this presentation***.

Anyone with a modicum of music history knowledge will recognize the top two artists in the list as giants of the Bossa Nova movement which was huge during the 50s and 60s. This music went global with Frank Sinatra and Stan Getz among many others to record their songs. We hear it in various forms to this day in elevators and chill-out bars around the world. ***To suggest that young Brazilians primarily stream Bossa Nova on their phones today is akin to saying Americans mainly listen to Elvis and Frank Sinatra*** while the British primarily stream Beatles classics. To summarize these top 5:

| | | | |
|---|---|---|---|
| 1 | Antonio Carlos Jobim | Bossa Nova, Big in 60s | Died 1994 |
| 2 | Vinicius de Moraes | Bossa Nova, Big in 60s | Died 1980 |
| 3 | Elis Regina | Bossa Nova, Big in 60s | Died 1982 |
| 4 | Gilberto Gil | Big in 70s - 80s | 77 yrs old |
| 5 | Marisa Monte | Big in 90s | 52 yrs old |

Brazil does have a huge music market today with young artists and music styles. It is absolutely impossible that a representative sample of the Brazilian online population would stream primarily these relics of history. It is also impossible that anyone with even a bit of local music knowledge would guess that any of these were anywhere near the top streamed artists between 2015 and 2018 in Brazil.

A brief look at the other "markets" top artists shows somewhat more plausible results although again, ***Russian top stream, the band TaTu was dissolved in 2011 and was largely famous internationally for risqué videos: they definitely would not have been the top streamed artist between 2015-2018 in Russia***.

It appears therefore that these lists have been compiled without any access to local knowledge or information as would be expected from a popular music platform.

(Emphasis added.)

39.     The Report stated the following, in pertinent part, about the Company's user base:

***Search volume for Akazoo is negligible***, especially if compared with competitors claiming similar user bases. For example, Pandora has some 80m users and Deezer 14m (vs 44m claimed by Akazoo). Yet, the search volume for the Greek company is almost trivial compared to both firms.

\*       \*       \*

Because Akazoo's business model is similar to that of many competing apps in the market (e.g. Pandora, Spotify, Tidal, TuneIn, etc.), one would expect it to score comparably in basic industry ratios. For example, a selection of Akazoo's competitors shows that there is on average 1 app review for every 31 registered users on Google Play (the Android app store). Other ratios we checked include revenue/employee, subscribers/employee and others. ***While its competitors exhibit ratios which are similar to one another, Akazoo's figures tend to be an extreme outlier. For example, Akazoo claims to have over 500 users per review while its competitors on average have about 31.*** So, either Akazoo's users are far more reluctant to write reviews or the Company's user base is a lot smaller than what management has been telling investors. Similar anomalies show up also in the number of likes/followers on social media and in revenue/employee ratio.

. . . ***By extrapolating the average figures and applying them to Akazoo, we estimate that its users base may be inflated by at least a factor of 10.*** [Images omitted.]

**Trends analysis: Akazoo's visibility is negligible**

\*       \*       \*

On an absolute basis, search volume for Akazoo appears to have peaked somewhere around 2011-2012 and has since shrunk to almost zero. This fact obviously clashes with growth rates and trajectory claimed by the Company.

The near totality of web searches originates in Cyprus and Greece, rather than in the emerging countries where Akazoo claims to be so popular.

\*       \*       \*

**Data from third-party apps confirms: Akazoo app number of downloads is minimal**

\*       \*       \*

Akazoo scores pitifully on both platforms. ***For Sensor Tower, Akazoo was below the minimum threshold for detection (<5000 downloads). Worse still, Mobile Action seems to estimate the number of Akazoo downloads at about 40/month (December 2019). Obviously, such dismal data is impossible to reconcile with the 44m of registered users growing at double-digit rates claimed by management.*** Should anyone doubt the accuracy of the software we used, we performed the same analysis on several competitors of Akazoo's and the findings were consistent with the official figures reported by these companies. [Image omitted.]

34

**The app reviews: few and shameless**

Opening the Akazoo page on Google Play (the Android app store) something odd immediately jumps to the eye: the most relevant text reviews date as far back as January 2019 (15 months ago) and, perhaps surprisingly for an app that claims to cater mostly emerging markets, are signed by three Greek-sounding names. The authors of these reviews are: Chris Spiliotopoulos, Yiannis Karalis and George Zervos. As you can readily verify clicking on the hyperlinks, these characters are all Akazoo's senior employees and the latter, George Zervos, may be the brother of the company's CEO. A quick glance of the remaining reviews shows that many of them look fake or complain about the app being either unusable, disappointing or claim having downloaded it to get credits elsewhere.

(Emphasis added.)

40.     The Report stated the following, in pertinent part, about the Company's offices and

staffing:

**The incredible shrinking Akazoo**

*According to Akazoo's official filings, the Company's headcount decreased by 17% per year from 45 to 26 in 2016-2018 (we estimate the current number to be even lower). One has difficulty reconciling these figures with the claimed revenue growth rate of 24%*: why would a company claiming to grow at that rate *halve* its workforce in three years starting from an already impossibly low base?

*The very low number of employees (26 or less) on $145m of sales implies a most unlikely $5.5m of sales/employee.* This ratio is 8x times higher than the ratio for its peer group and for companies such as Facebook or Apple (which have industry-leading ratios).

*Consistent with the significant shrinking headcount, we noticed that Akazoo seems to have closed most (or perhaps all) of their offices outside of Greece, including their headquarters in London.* We visited recently Akazoo's London headquarters at the Pavillon Center at 96 Kensington High Street, in London UK. The facility is a co-working space akin to WeWork. After speaking with the receptionist, we learned that Akazoo left the premises a long time ago. Even at its peak, the office was apparently manned by only four people: Pablo, George, Neilah and Pierre. We believe these names may correspond to Pablo Monstrous, Nailah Peeroo, George Zervos and Pierre Schroeder (CFO): *the former three have left the UK office in February 2019, while Pierre lingered until December then closed down the office permanently*. We also visited other addresses in London, including the ones of their subsidiary R&R, and found them either closed or belonging to Akazoo's legal advisors rather than to Akazoo proper.

The office in the Ukraine is also either closed or in the process of being closed as Tatiana Ostapenko, Akazoo's Chief Accountant, is *"open for offers"* on her LinkedIn page and cites as a reason "***[Akazoo's] HQ is currently closing business in Ukraine***".

We also visited the Luxembourg address in Rue de Bitbourg and failed to find any trace of Akazoo whatsoever (we presume that this address belongs to Akazoo's legal advisors). Similarly, our field sources claim that Akazoo has no proper office in Cyprus and may be using an accountant's address or similar. So, where in fact is Akazoo? The company may be operating from some other unknown location, but ***QCM did find an Akazoo's office inside the headquarters of its former parent company InternetQ in Athens***, at 340 Kifissias Ave, Neo Psychiko. The (barely readable) sign on the doorbell simply says "*InternetQ*".

(Emphasis added.)

41.     Also on April 20, 2020, QCM released a slideshow (the "Slideshow") supplementing the Report.

42.     The Slideshow noted the following, in pertinent part, regarding Akazoo's finances:

• **Suspicious signs of accounting manipulation:**
• **Cash inconsistencies; total lack of taxes.**

*     *     *

**WHY AREN'T SALES TRANSLATING INTO CASH? WE SEE LARGE AND GROWING ACCOUNT RECEIVABLES…**

**Akazoo sales don't translate in cash, but in unexplained, increasing account receivables…** [Image omitted.]

**…OUT OF LINE WITH INDUSTRY PEERS: AKAZOO DSO [Days Sales Outstanding] ARE A SUSPICIOUS OUTLIER…**



**WHY DOES AKAZOO PAY ZERO TAXES DESPITE CLAIMING $22M IN PROFIT FOR THE LAST FOUR YEARS???**



43.     The Slideshow stated the following regarding Akazoo's music distribution rights:

**QCM CHECK: MUSIC DISTRIBUTORS**

• We checked with Sony Music, a major music distributor to Akazoo.
• *Akazoo has purchased distribution rights for only 5 (five) countries*, namely:

• Greece, Cyprus, Poland, Ghana and Malaysia.
• *We fear that either Akazoo is lying about its geographic reach (25 countries claimed) or may be breaching music copyrights.*

(Emphasis added.)

44.    The Slideshow stated the following, in pertinent part, about Akazoo's global reach:

• *App unavailable in many core countries*.

\*          \*          \*

• QCM has attempted to open an [Akazoo] account in dozens of countries.
• We succeeded in opening an account (using a VPN) only in Poland, Malaysia, Indonesia, Greece, Cyprus.
• *For other countries we tried, including those where Akazoo claims to be active in, we received the following message: "We would really like to be here. For now, our service is not available in your country. Please check back, you never know."*



(Emphasis added.)

45.    The Slideshow stated the following, in pertinent part, about Akazoo's user base:

We use three third party tools to estimate the number of downloads of Akazoo app and traffic on its websites.

**The Evidence: numerical analysis**

Akazoo's operating metrics are indicative of a far smaller company

AKAZOO CLAIMS SUBSCRIBERS AND REVENUE COMPARABLE TO ITS COMPETITORS… [Image omitted.]

NUMBER OF USERS PER REVIEW: AKAZOO RATIO IS 17 TIMES HIGHER THAN AVERAGE…



REVENUE PER EMPLOYEE: AKAZOO RATIO IS 8X HIGHER THAN AVERAGE…



OTHER STATISTICS TELL A SIMILAR STORY…



PANDORA HAS 1500 TIMES (!) MORE INSTAGRAM FOLLOWERS THAN AKAZOO (DESPITE COMPARABLE NUMBER OF CLAIMED SUBSCRIBERS) [Image omitted.]

PANDORA HAS 370 TIMES (!) MORE FACEBOOK FOLLOWERS THAN AKAZOO (DESPITE COMPARABLE NUMBER OF CLAIMED SUBSCRIBERS) [Image omitted.]

EXTRAPOLATING FROM PEER AVERAGES: AKAZOO MAY HAVE LESS THAN 400K SUBSCRIBERS (VS 5.5M CLAIMED)[] [Image omitted.]

GOOGLE TRENDS SUGGEST THAT BARELY ANYONE SEARCHES FOR
«AKAZOO» ANYMORE…



GOOGLE TRENDS: AKAZOO IS VIRTUALLY UNDETECTABLE VS. PEERS
CLAIMING COMPARABLE SUBSCRIBER BASES [Image omitted.]

                    *        *        *

MOBILE ACTION: ONLY 40 DOWNLOADS, UNDETECTABLE REVENUE
(DEC 2019)

                    *        *        *

**The Evidence: app reviews**

A large portion of the (very few) reviews appearing on Google apps store, have
been written by Akazoo's employees, including senior management

41



46.     The Slideshow stated the following, in pertinent part, regarding Akazoo's closing

offices and staffing:

- Disappearing infrastructure
    - (undisclosed) closed offices
    - Disappearing workforce

*        *        *

**The Evidence: infrastructure**

*Despite claiming multiple offices around the world, our field due diligence revealed that Akazoo has closed offices in most of its locations.*

42



AKAZOO'S MAIN OFFICE IS IN 96 KENSINGTON, LONDON. REALLY???

QCM FIELD CHECK IN LONDON AT 96 KENSINGTON PAVILLION CENTER

Receptionist: «Akazoo left several months ago!» [Images omitted.]

*       *       *

AKAZOO BUSINESS IN UKRAINE…CLOSING UP!

• Akazoo's Chief Accountant in her LinkedIn profile is open for offers since Akazoo is closing business in Ukraine!

• According to our sources Akazoo/R&R has shut down business in both the UK and Ukraine.

(Emphasis added.)

47.     On this news, Akazoo shares fell $0.53 per share over the rest of the trading day and the next trading day, or over 20%, to close at $1.99 per share on April 21, 2020, damaging investors.

48.     On May 1, 2020, Akazoo filed with the SEC a Form 6-K which announced the termination of Defendant Zervos, the Company's CEO, "for cause" and that investors could not rely on previously issued financial statements. The 6-K provided the following, in pertinent part:

**Appointment of Interim CEO; Termination of Chief Executive Officer**

On May 1, 2020, the Board of Directors (the "Board") of Akazoo S.A. (the "Company") announced the appointment of Michael Knott as interim Chief Executive Officer, effective immediately. This *followed the decision by the Board to terminate Apostolos N. Zervos as Chief Executive Officer for cause*. The Board has also requested that Mr. Zervos resign as a member of the Board.

*        *        *

*The Special Committee has nonetheless been unable to verify certain operational and financial information previously reported by the Company.* Accordingly, the Special Committee has concluded that *the consolidated financial statements (i) of Akazoo Limited for the years ended December 31, 2018, 2017 and 2016* (and any interim periods therein) audited by the Company's former independent registered public accounting firm and included or incorporated by reference in the Company's Shell Company Report on Form 20-F filed with the U.S. Securities and Exchange Commission (the "SEC") on September 17, 2019; (ii) *of Akazoo Limited for the three- and six-month periods ended June 30, 2019 and 2018* included in the Company's Report on Form 6-K furnished to the SEC on September 27, 2019; and (iii) *of the Company for the three- and nine-month periods ended September 30, 2019 and 2018* included in the Company's Report on Form 6-K furnished to the SEC on December 9, 2019 should no longer be relied upon *due to the possibility that such financial statements contain material errors.*

(Emphasis added.)

49.     On this news, Akazoo shares fell 3% to close at $1.163 per share, further damaging investors, before trading was halted at 9:30 am on May 1, 2020.

50.     On May 21, 2020, Akazoo issued a press release announcing that a special committee investigation had determined that former Akazoo management and associates participated in a "multi-year fraud." The press release stated, in pertinent part:

NEW YORK and LONDON, May 21, 2020 /PRNewswire/ -- Akazoo S.A. ("Akazoo") today announced that the special committee of independent directors (the "Special Committee") has substantially completed its investigation and

determined that *former members of Akazoo's management team and associates defrauded Akazoo's investors, including the predecessor SPAC acquiring entity Modern Media Acquisition Corp. ("MMAC"), by materially misrepresenting Akazoo's business, operations, and financial results as part of a multi-year fraud*.

*In particular, the Special Committee has determined, among other things, that (i) Akazoo's historical financial statements, which have been audited by multiple, experienced global accounting firms for years, were materially false and misleading; (ii) Akazoo, in fact, has had only negligible actual revenue and subscribers for years; and (iii) former members of Akazoo management and associates participated in a sophisticated scheme to falsify Akazoo's books and records, including due diligence materials provided to MMAC and its legal, financial, and other advisors in connection with the Akazoo business combination in 2019*.

As previously disclosed on April 22, 2020, Akazoo's board of directors formed the Special Committee to investigate allegations in a report released by Quintessential Capital Management on April 20, 2020. The Special Committee took immediate action. On May 1, 2020, Akazoo announced it had terminated Apostolos N. Zervos as Chief Executive Officer for cause, following a recommendation by the Special Committee based on evidence of conduct inconsistent with the Company's policies, including a lack of cooperation in the Special Committee's investigation. The termination of Mr. Zervos for cause was followed by the May 1, 2020 appointment of Michael Knott, a Senior Managing Director at FTI, as interim Chief Executive Officer. The appointment of Mr. Knott significantly expedited the Special Committee's investigation and exposure of the multi-year fraud.

The Company intends to take all available steps to maximize recovery for defrauded investors, including by seeking to unwind the original business combination between MMAC and Akazoo. The Special Committee has also directed its advisors to make referrals to, and cooperate with, appropriate regulators.

Akazoo also announced today that it has received an anticipated letter of delisting from The Nasdaq Stock Market LLC. The Company does not intend to appeal the decision, and as a result, the Company's securities will be suspended from trading on Nasdaq at the opening of business on May 27, 2020.

(Emphasis added.)

51.     As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

52.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who: (1) purchased or otherwise acquired the publicly traded securities of Akazoo during the Class Period; and (2) all persons or entities who held common stock of MMAC on August 14, 2019 eligible to vote at MMAC's August 28, 2019 special meeting (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

53.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

54.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

55.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

56.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

57.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

58.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NASDAQ, and was covered by market analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)     Plaintiffs and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h)     Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

59.     Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

60.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material

information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

61.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

62.     This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

63.      During the Class Period, the Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

64.     The Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

65.     The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or

dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

66.    The Individual Defendants, who were senior officers and directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

67.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

68.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Defendants' misleading statements and by the material adverse information which the Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

69.      As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

70.      By reason of the foregoing, the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

71.      Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

72.      During the Class Period, the Individual Defendants participated in the operation and management of Akazoo and MMAC, and conducted and participated, directly and indirectly, in the conduct of Akazoo's and MMAC's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

73.      As an officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Akazoo's and MMAC's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

74.      Because of their positions of control and authority as senior officers and directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Akazoo and MMAC disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Akazoo and MMAC to engage in the wrongful acts complained of herein. The

Individual Defendants therefore, were controlling persons of Akazoo and MMAC within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

75.     The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions and directors of Akazoo and MMAC, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Akazoo and MMAC to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of Akazoo and MMAC and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

76.     By reason of the above conduct, the Individual Defendants is liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Akazoo and MMAC.

**COUNT III**
**Violation of Section 14(a) of the Exchange Act and Rule 14a-9**
**Against All Defendants**

77.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

78.     The claims set forth herein do not sound in fraud and are based on negligent conduct by the Defendants named herein.

79.     The Defendants named herein violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder in that these Defendants solicited proxies from Plaintiffs and other members of the Class by means of a Proxy Statement that through Defendants' negligence contained statements which, at the time and in the light of the circumstances under which they were made, were false

and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

80.     Plaintiffs and other members of the Class were misled by Defendants' false and misleading statements and omissions, were denied the opportunity to make an informed decision in voting on the merger, and approved the merger without having been advised of material facts. Accordingly, Plaintiffs and other members of the Class did not receive their fair share of the value of the assets and business of the combined entity, suffered damages when the Company's stock price decreased, and were prevented from benefitting from a value-maximizing transaction.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated: June 19, 2020                    Respectfully submitted,

                              **THE ROSEN LAW FIRM, P.A.**

                              /s/Phillip Kim
                              Phillip Kim, Esq. (PK 9384)
                              Laurence M. Rosen, Esq. (LR 5733)
                              275 Madison Ave., 40th Floor
                              New York, NY 10016

Tel: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

*Counsel for Plaintiffs*

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Additional Counsel for Plaintiffs*